AFFIDAVIT OF VIRGINIA HALE

STATE OF OHIO         )
                      )  SS:
COUNTY OF GEAUGA      )

VIRGINIA HALE, being first duly sworn, do avow and aver:

1) I am a resident of the State of Ohio and I reside at Newbury, Ohio

2) I am the President of NorthEast Escrow Services, a company that is in the business of providing escrow and related services located at 12550 Chillicothe Road, Chesterland, Ohio 44026.

3) From March 1997 through April 1999, I worked in the capacity of office manager for Viatical Escrow Services ("VES").

4) The owner and operator of VES was James A. Capwill, who after embezzling funds being held in escrow, was convicted in federal court and is currently incarcerated in a federal prison.

5) VES was in the business of providing escrow and related services to companies engaged in the investment and marketing of viatical settlements. It was the duty of VES to hold and safeguard all escrow funds for viatical investments, pay commissions, track the lives of viators, pay premiums, distribute funds, and interact with insurance companies.



1

6) Mr. Capwill also owned and operated several other companies from the same location which provided services related to his escrow activities, including Capital Fund Leasing (CFL) and Capwill & Company, which served as trustee for many trusts formed for the sole purpose of nominally owning viaticated policies.

7) One of the companies for whom VES provided escrow and related services was Liberte Capital Group ("Liberte"). Liberte was a limited liability company organized under the laws of the state of Ohio, and operating out of offices in the state of Ohio. Liberte did not maintain any office in the state of Delaware.

8) One of the companies for whom VES provided escrow and related services was Alpha Capital Group ("Alpha"). Alpha was a limited liability company organized under the laws of the state of Delaware, but operating out of offices in the states of New York and Indiana. Alpha did not maintain any office in the state of Delaware.

9) Liberte and Alpha were funding companies, which purchased viatical settlements from independent brokers and then offered interests in the viatical settlements for sale to investors through independent agents. As a matter of course, neither Liberte nor Alpha purchased policies directly from viators or sold policies directly to investors.

10) As Office Manager for VES, I was charged with the task of overseeing all closing transactions on viaticated policies including the allocation and distribution of funds (including those funds designated for use as future premiums), as well as the execution of appropriate documents and/or the initiation of communications with insurers necessary to facilitate transactions. I was also charged with collecting and maintaining all investor contracts and viator contracts, as well as processing checks, which VES received from Alpha and Liberte, and I was conversant with the accounting records of VES and was custodian of the same.

11) On April 8, 1999, Liberte filed suit against Capwill, VES, and CFL. Alpha intervened shortly thereafter naming additional defendants.

12) On April 15, 1999, I terminated my employment with VES and began operating Northeast Escrow Services. One of the companies I provided escrow services for was Alpha, which stopped utilizing the services of VES for any new transactions. VES did, however, continue to provide escrow services regarding all of Alpha's viaticated policies in its custody prior to April 15, 1999.

13) On July 15, 1999, VES was placed in receivership by the U.S. District Court for the Northern District of Ohio in the matter captioned *Liberte Capital Group, LLC et al. v. James A. Capwill, et al.*, case no. 99 CV 818. Frederick Luper was appointed as the Receiver.

14) On November 9, 1999, the Receivership was extended to include all insurance policies funded by investors of Liberte Capital Group or Alpha.

15) Through a Federal Court Order, dated October 29, 2001, the United States District Court, Northern District of Ohio, established a second receivership in *Liberte v. Capwill*, appointing William T. Wuliger, an attorney licensed to practice law in the State of Ohio, to take direction and control of all of Alpha's business activities and functions; granting him full authority and ownership over all Alpha-owned policies; and charging him with the responsibility of protecting the Alpha investors.

16) Also in October 2001, I was appointed escrow agent by Order of the United States District Court, Northern District of Ohio. Pursuant to my duties under my appointment, I act as the custodian of record of all records for the Alpha Capital Receiver, William T. Wuliger, who was appointed Receiver by Order of the United States District Court on October 29, 2001, as well as all records for the General Receivership established on July 15, 1999, which I store at the offices of Northeast Escrow Services in Chesterland, Ohio.

17) In August 2004, the federal court transferred authority to Mr. Wuliger over the General Receivership, including full authority and ownership over all Liberte-owned policies.

18) The records which I hold by virtue of my appointment as escrow agent by the federal court, include legal documents, financial and accounting papers, daily correspondence, all investor, agent and viator files, and an actual mirrored image computer hard drive of all files of VES as originally kept on the company's hard drive.

19) General Receivership records reflect that there are approximately 2,400 Liberte investors, only one of whom, Millicent Cheitlin, currently resides in the state of Delaware. Ms. Cheitlin is the widow of Daniel Cheitlin, another Liberte investor, who also resided in Delaware before his death.

20) The Cheitlins' investment with Liberte was arranged through a Liberte agent residing in the state of Florida. General Receivership records reflect that there are no Liberte agents residing in the state of Delaware.

21) The Cheitlins jointly executed a single contract with Liberte in West Palm Beach, Florida. The Cheitlins designated three beneficiaries in their investment contract, none of whom reside in Delaware. A copy of the contract is attached hereto as Attachment 1.

22) Out of approximately 1,000 viaticated policies purchased by Liberte only one insured a viator residing in the state of Delaware: Livingston Lee. Mr. Lee's policy was issued by United Commercial Travelers. The policy was not among

those listed by the Department of Justice as suspected of having been obtained by fraud. It subsequently lapsed for nonpayment of premiums.

23) Alpha Receivership records reflect that there are approximately 1,100 Alpha investors, none of whom reside in the state of Delaware.

24) Alpha Receivership records reflect that there are no Alpha agents residing in the state of Delaware.

25) Out of approximately 1,000 viaticated policies purchased by Alpha, none insured viators residing in the state of Delaware.

26) The investor records establish that the total outstanding investment of Alpha investors is approximately $61 million and the total outstanding investment of Liberte investors is at least $100 million. Current combined cash assets of the General and Alpha Receiverships total only approximately $19 million.

27) I have reviewed the list of Liberte and Alpha "policies at issue" in the Complaint in *Reassure America Life Insurance Company, et al. v. Alpha Capital Group, et al.*, Case No. 01:05 CV 117, currently pending in the U.S. District Court for the District of Delaware, and I have compared it against the Receivership records. Based on that review, I have determined that:

      (a) the Liberte-owned policy insuring Livingston Lee was not issued by any of the plaintiffs named in the complaint and is not listed as a policy at issue therein;

      (b) Daniel and Millicent Cheitlin's investment was never matched to any of the policies at issue listed in the complaint, nor was it matched to any policy that was later designated as fraudulent;

28) I have also reviewed the Complaint filed in *Southwestern Life Insurance Company v. Willliam T. Wuliger*, Case No. 2004-04-2060 in the Court of Common Pleas for Summit County, Ohio, including the Default Declaratory Judgment relating to Integon Life Insurance Co. policy no.         470 insuring the life of Jeffrey D. Ross issued in *Security Life and Trust Company fka Integon Life Insurance Corporation v. Estate of Jeffrey D. Ross*, Case No. 2000 05 2223 in the Court of Common Pleas for Summit County, which is attached as an Exhibit thereto. Based on that review, I have determined that Integon Life Insurance Co. policy no.         470, insuring the life of Jeffrey D. Ross is not among the Liberte and Alpha "policies at issue" listed in the complaint in *Reassure America Life Insurance Company, et al. v. Alpha Capital Group, et al.*

FURTHER AFFIANT SAYETH NOT.

*Virginia Hale*
VIRGINIA HALE

Given under my hand and seal of office this 23 day of March 2005.

*Ben Hale*
NOTARY PUBLIC

My Commission expires: September 18, 2007.



BEN HALE, Notary Public
State of Ohio
My Commission Expires September 18, 2007

# LIBERTE CAPITAL GROUP

## AGENCY AGREEMENT AND SPECIAL POWER OF ATTORNEY APPOINTMENT

THIS AGREEMENT is made and entered into by and between **Daniel L and Millicent S Cheitlin**, (hereinafter referred to as PURCHASER) and LIBERTE CAPITAL GROUP (LCG) (hereinafter referred to as AGENT).

WHEREAS, AGENT is a company engaged in the location, qualification, administration and purchases, as AGENT, of life insurance policies (and related death benefits) of terminally ill persons on a discounted basis (which are hereinafter referred to as "Viatical Settlements"); and

WHEREAS, PURCHASER desires to fund one or more of such Viatical Settlements, and has reviewed and approved the underwriting criteria used by AGENT to evaluate and qualify such policies for Viatical Settlements;

THEREFORE, the parties hereby enter into a relationship of PURCHASER and AGENT whereby AGENT is authorized, pursuant to one or more PREFERENCE FORMS, to fund Viatical Settlement of qualified, terminally ill applicants on behalf of PURCHASER pursuant to the terms and conditions set forth herein.

1. AGENT shall locate and assist PURCHASER in the funding of Viatical Settlements selected by PURCHASER which comply with the following criteria:
   a. Each policy must be incontestable and the insurance carrier must have a current rating of B+ (Very Good) or better from A.M. Best or a similar rating from an equivalent rating organization.
   b. Each Insured must be diagnosed as terminally ill, with a predicted life expectancy between three and sixty months, and with a statistical confidence level of at least seventy percent.

2. PURCHASER acknowledges that AGENT has made available the opportunity to obtain information in order to evaluate the merits and risks of this relationship and the purchase of Viatical Settlements. PURCHASER represents and warrants that by reason of its business and financial experience, PURCHASER has the capacity to understand the purchases contemplated by this Agreement and to protect himself or herself with respect thereto. **PURCHASER further represents that he/she has received the LIBERTE CAPITAL GROUP Brochure and is basing his/her decision to purchase Viatical Settlements solely upon the information and representations made therein.** PURCHASER further acknowledges that the risks associated with Viatical Settlements include, but are not limited to, the following; (a) the insured may live longer (possibly much longer) than the life expectancy estimated by AGENT'S medical reviewer(s); and, (b) new and more successful medical interventions, including new and more effective drugs, may appear before the Insured dies, and such may extend the Insured's life, perhaps substantially (which may require additional escrow deposits for premiums, see paragraph 6); and (c) delay in learning of the Insured's death may lead to a delay in receiving payment of the death benefit on the Insured's life insurance; and (d) despite the fact that AGENT only considers life insurance policies issued by well rated insurance companies, receipt of the death benefit may be delayed or frustrated by the insolvency of the life insurance company at the time of the Insured's death and before the death benefit is collected (most states do have insolvency pools behind their life insurance companies)

3. PURCHASER hereby appoints AGENT as his or her true and lawful agent and attorney in fact to:
   a. Enter into any agreements or contracts to facilitate the purchase of the Viatical Settlement(s) designated by PURCHASER'S PREFERENCE FORM attached hereto.
   b. Complete any document reflecting the transfer of ownership collateral assignment, and/or irrevocable assignment of death benefits with the insurance carrier issuing the policy purchased in the Viatical Settlement.
   c. Enter into escrow agreements with an independent escrow agent and give instructions with respect to same.
   d. Direct escrow agent to disburse fees and commissions to LCG upon receipt of PURCHASER'S escrow deposit.
   e. Pay from a Premium Reserve Account (described in detail in paragraph 6 below) premiums that may be or become due on any life insurance policy, that may be purchased, in whole or in part, with PURCHASER'S funds.
   f. Do all other actions which, in Agent's sole discretion, may be necessary to facilitate the purchase of Viatical Settlement(s) which may include signing other contracts and agreements, for and on behalf of PURCHASER.
   g. PURCHASER acknowledges that it is not the responsibility of the AGENT to report gains from the Viatical Settlement to the Internal Revenue Service for Income Tax purposes.

4. This SPECIAL POWER OF ATTORNEY shall convey NO OTHER AUTHORITY to AGENT other than as specifically set forth in subparagraphs 3(a)(b)(c)(d)(e)(f) and (g) above.

5. If for any reason AGENT is unable to locate a suitable viatical settlement for PURCHASER to acquire within sixty (60) days following the execution of this Agreement, then PURCHASER may request the return of his or her remaining funds by transmitting an original, notarized written request to Escrow Agent, with a copy transmitted to AGENT. Within five (5) business days of receiving such a written request, Escrow Agent shall return to the PURCHASER the remaining monies it is holding in the PURCHASER'S unallocated account.

6. AGENT shall establish a Premium Reserve Account (PRA) with the Escrow Agent, which shall hold and maintain in a single escrow account the premium reserves of all PURCHASERS. If an insured dies prior to the payment of the premium monies

Page 1 of 2

**EXHIBIT H**

escrowed at the closing of tne viatical sale of his or her life insurance policy, which are in amounts sufficient to pay premiums o the viaticated policy for two (2) times the insured's estimated remaining life expectancy, then any such remaining and exces escrowed funds shall remain in the collective PRA, where they will be available to pay premiums on other viaticated life insuranc policies, if the PRA escrow of premiums of two (2) times estimated remaining life expectancy for any of those policies should b exhausted. If the PRA escrow of two (2) time premiums for the insured's estimated remaining life expectancy, plus exce˙ ˙R˙ monies that were not used to pay premiums for other insureds prior to their deaths, should be completely exhauste   ˙e PURCHASER would be called upon to pay any additional premiums that might become due prior to the death of the insurec however, this has never happened in the history of AGENT. AGENT and its Managing Director, Richard Jamieson, have bee involved in the viatical settlement business since 1993, during which they have handled the sale of hundreds of viaticated lif insurance policies, always escrowing monies at each closing to pay premiums on each purchased life insurance policy. Using thi escrow method, neither AGENT nor Mr. Jamieson has ever had to ask any PURCHASER for additional funds to pay polic premiums. Therefore, based on historical experience, AGENT believes that the monies held in the PRA escrow will be sufficier to pay the premiums due on a life insurance policy bought by PURCHASER until the insured dies. In the unlikely, but theoreticall possible, event that the PRA escrow funds are exhausted prior to the insured's death, PURCHASER may be required to depos˙ additional money into the PRA to keep the life insurance policy in force until the insured dies.

7. This agreement represents the entire and sole agreement between the parties hereto regarding their agency relationship. No other representation, agreement, or covenants, whether written or oral, shall govern such relationship.

8. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia. For purposes of any legal action that may arise out of this Agreement or the performance by any party under its terms, PURCHASER consents to the jurisdiction and venue in the Superior Court of Gwinnett county.

9. PURCHASER acknowledges that he or she understands the meaning and legal consequences of the above representations and warranties. PURCHASER agrees to indemnify and hold harmless AGENT and its principals/ Representatives, officers, directors, agents and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by PURCHASER.

PURCHASER'S NAME  Millicent S. Cheitlin  S.S. #  9735

CO-PURCHASER'S NAME  Daniel L. Cheitlin  S.S. #  -9787

Purchaser's Address _____

City  Wilmington  State  De  Zip _____  Phone _____

_Millicent S. Cheitlin_          _Daniel L. Cheitlin_
Purchaser's Signature           Purchaser's Signature

Signed at:  West Palm Beach , on the  2  day of  March , 1998

Representative's Name: _Maynard Pulverly_  Representative's #  PR-326

# LIBERTE CAPITAL GROUP

ADDENDUM TO
AGENCY AGREEMENT AND SPECIAL POWER OF ATTORNEY APPOINTMENT
FOR NON-CONFORMING POLICIES

AGREEMENT entered into between **Millicent S. Cheitlin and Daniel L. Cheitlin**, hereinafter referred to as PURCHASER and LIBERTE CAPITAL GROUP (LCG) hereinafter referred to as AGENT.

WHEREAS, AGENT is in the business of locating, qualifying and administering loans and purchases, as AGENT, of life insurance policies (and related death benefits) of terminally ill persons on a discounted basis hereinafter referred to as Viatical Settlements; and

WHEREAS, PURCHASER desires to fund one or more of such Viatical Settlements, and has reviewed and approved the underwriting criteria used by AGENT to evaluate and qualify such policies for Viatical Settlements; and

WHEREAS, PURCHASER desires to waive the requirement that the policy must be incontestable;

THEREFORE, in consideration of the mutual covenants herein, the parties agree as follows:

1. PURCHASER hereby waives the requirement set forth in paragraph 1(a) of the AGENCY AGREEMENT AND SPECIAL POWER OF ATTORNEY APPOINTMENT between LCG and PURCHASER dated **10/1/98** that the policy must be incontestable.

2. PURCHASER acknowledges that AGENT has made available the opportunity to evaluate the merits and risks of this relationship and Non-Conforming Viatical Settlements. PURCHASER represents and warrants that by reason of his or her business and financial experience, PURCHASER has the capacity to understand this purchase and to protect his or her interests with respect to such purchase. PURCHASER also acknowledges and understands an additional risk is that the insurance policy may be rescinded during the contestability period. Recision may only be made if the insurance company can prove that material misrepresentation was made by the insured on the life insurance application. Since the burden of proof is upon the insurance company to prove that a misrepresentations may have been made, LIBERTE CAPITAL GROUP considers the possibility of recision to be very unlikely. PURCHASER further represents that he or she has received the LIBERTE CAPITAL GROUP Non-Conforming Viatical Settlement Disclosure Document and is basing his or her decision to purchase Non-Conforming Viatical Settlements upon the information and representations made therein and the disclosure made in this addendum.

3. PURCHASER acknowledges the understanding and meaning of the legal consequences of the above representations and warranties. PURCHASER agrees to indemnify and hold harmless AGENT and its principals, representatives, officers, directors, agents, and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by PURCHASER.

4. This AMENDMENT agreement may be terminated at any time by either party in a written request delivered to other, provided no Viatical Settlement is pending with funds of PURCHASER on deposit with AGENT.

PURCHASER'S NAME **Millicent S. Cheitlin** S.S. # _____

CO-PURCHASER'S NAME **Daniel L. Cheitlin** S.S. **-9787**

Purchaser's Address _____

City **Wilmington** State **DE** Zip _____ Phone # _____

X **Millicent S. Cheitlin**            **Daniel L. Cheitlin**
Purchaser's Signature                 Purchaser's Signature

Signed at: **West Palm Beach, FL**, on the **1st** day of **Oct**, 19**98**

Representative's Name: **Maynard P. Weinberg** Representative's # **PR 326**

BENEFICIARY DESIGNATION OTHER THAN PURCHASER
Split in the percentages following their names

ROBIN A. CRIST           -40%

EARLYSVILLE, VA.

S.S.            .8809

PHONE -


ALEECE M. HORDEN  -40%

WAUCONDA, ILL.

S.S.           5311

PHONE -


MARLENE W. SKINNER  -20%

ROCKY MT., N.C.

S.S.           7085

PHONE -